# Exhibit 9, Part 2

**Figure 5: Flex Futures Trade Confirmation from FGC Securities to the RJM Plan**[62]

FGC

FGC SECURITIES LLC
12 Desbrosses Street
New York, NY 10013
e: execution@fgcsecurities.com

CLIENT: RJM CAPITAL PENSION PLAN
REF #: RJMC_MAERS_20130613_0003_A1
DATE: June 13, 2013

**EQUITY FUTURES CONFIRMATION**

Client and FGC Securities agree that this confirms the terms and conditions of the following Equity Futures Transaction:

| | |
|---|---|
| Transaction Type Type: | SINGLE STOCK FUTURES |
| Listed / OTC | LISTED |
| Futures Trade Date: | June 13, 2013 |
| Client | RJM CAPITAL PENSION PLAN |
| Buy / Sell: | BUY |
| Futures Contract: | MAY (MAERSKB DC) JUN13 Bclear Flex Futures |
| Exchange: | BCLEAR |
| Futures Quantity: | 104 |
| Futures Price: | 40,750.9400 |
| Futures Expiry Date: | June 21, 2013 |
| Futures Notional: | 423,809,776.00 |
| Settlement Type: | CASH |
| Underlying Reference: | MAERSKB DC \| AP MOELLER-MAERSK A/S-B \| 4253048 |
| Reference Units: | 10,400 |
| Trade Currency: | DKK |
| Reference Price: | 40,750.2863 |
| Reference Notional: | 423,802,977.52 |
| Delta: | 100.00 |
| Multiplier: | 100.00 |

| | | |
|---|---|---|
| Commission: | 10,595.24 | DKK |
| USD FX: | 5.59 | |
| **Commission** | **1,895.39** | **USD** |

**To be invoiced montly*

*We thank you for the opportunity to have been of service to you and trust that the above correctly represents your understanding of the transaction in question. Failure to object in writing to the transaction confirmed above by the earlier of 24 hours after your receipt of this confirmation or prior to 9 a.m. local market time on the settlement date shall be deemed your agreement to the correctness of this confirmation. Please note we have acted only as agent in this transaction and are not responsible for the financial viability of any counterparties we have matched you with nor are we responsible for the performance of this or any other transaction we have arranged. You agree that FGC shall have no liability to any party if any party is for any reason restricted from entering into or fails to perform obligations within this transaction*

Regards,
**FGC Securities**

Highly Confidential MPSKAT00085291

62 MPSKAT00085291.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

43.  As I explained in Initial Carr Report, "Solo Capital accessed BClear through JP
Morgan Chase because '[f]irms wishing to access the [BClear] system either have to
be a member firm of LIFFE (Euronext Liffe London) or to have a clearing agreement
in place with a member firm.'"[63]

44.  While Mr. Dubinsky asserts that the absence of Danish shares in the Solo sub-
custodian accounts that he identified and reviewed shows that the pension plans
never held Danish shares,[64] he failed to address whether there were transactions in
flex futures contracts present in those sub-custodian accounts.  Instead, Mr.
Dubinsky states that he "**purposely omitted** a detailed discussion on the use of
forward contracts and futures contracts that were present."[65]  In contrast, Mr. Wade
acknowledges that the futures were present in sub-custodian accounts.[66]  Thus,
according to Mr. Dubinsky's logic, the presence of flex futures in Solo's sub-
custodian accounts is evidence that the plans' flex futures contracts were not fake.

45.  Mr. Wade, in turn, asserts that Solo "booked fictious (*sic*) open [flex futures]
positions in its clients' account statements" even though, as he is aware, these
positions are shown in statements issued by JP Morgan.[67]  In other words, without
any basis, Mr. Wade seems to assert that the JP Morgan statements he cites are fake.

46.  Mr. Wade only cites partial communication between JP Morgan and Solo Capital.
Specifically, he only reports Solo Capital's  response explaining that the
"commercial rational behind the business is to charge clients a premium for a facility
to clear through a Global Bank," and asserts that he does "not accept this

---

[63] Initial Carr Report ¶83.

[64] Mr. Dubinsky claims that he searched for "additional evidence of any other custodians or sub-custodians"
that may have had custody of Danish shares on behalf of the Solo Custodians and was "unable to find any such
evidence."  Dubinsky Report ¶135.  However, he cannot be sure that he has searched thoroughly as it is
unclear what the relevant sub-custodians are absent confirmation from Solo Capital, which is not a party to this
litigation.  For example, Mr. Dubinsky did not mention reviewing any records from the National Bank of Abu
Dhabi, which was a sub-custodian for Solo Capital.  SCPADMINISTRATORS_00013560-13917.

[65] Dubinsky Report, n. 7 (emphasis added).

[66] Wade Report ¶256.

[67] *Id.*

**Rebuttal Report of Emre Carr, Ph.D., CFA**

response."[68]  He fails to report that, on getting Solo Capital's response, JP Morgan further inquired, "For the transactions identified, can you please confirm that each trade had different buyers and sellers (i.e. different beneficial owners)?"[69]  Thus, JP Morgan's real concern was that trades should be for different buyers and sellers, and Mr. Wade has not provided any evidence that they were not.

47.  Mr. Wade also appears to take exception with the fact that Solo also provided custodian services for another client that engaged in the offsetting flex futures trades observing that "Solo itself never held an open futures position in its sub-custodian omnibus accounts."[70]  Naturally, if two of Solo's customers engaged in equal but offsetting flex futures trades, Solo would not have an open position.  The relevant analysis is whether both the positions appeared in Solo's omnibus account (with JP Morgan) used to access BClear because Solo could not directly access BClear.  As Mr. Wade acknowledges, both the offsetting positions do appear in JP Morgan's statement for Solo's omnibus account.[71]

48.  Mr. Wade further comments that Solo's futures "trading patterns are highly irregular" and that "it is not clear what purpose any of the IDBs serve in the Solo Transactions, but it is clear that they are complete pass-through entities which take no risk and have no opportunity for profit."[72]

49.  First of all, there is no reason why an IDB must take a risk while finding liquidity for investors.  For example, an IDB can facilitate the transaction on a matched principal basis wherein:

> *the facilitator interposes itself between the buyer and the seller to the*
> *transaction in such a way that it is never itself exposed to market risk*
> *throughout the execution of the transaction, with both sides executed*

---

[68] *Id. at* ¶257.

[69] ELYSIUM-01746161.

[70] *Id.*

[71] *Id.*  ("Because the Solo Pension Plans and the short sellers, such as Delvian and Gulf Management Group, took offsetting futures positions, Solo's position in its sub-custodians' futures omnibus accounts would net to zero.")

[72] *Id.* at ¶257.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

> *simultaneously, and where the transaction is concluded at a price* **where the facilitator makes no profit or loss, other than a previously disclosed commission, fee or charge for the transaction**.[73]

50. In this regard, Mr. Wade's assertion that the entities have no opportunity for profit ignores that the IDBs earned a commission on their transactions. For example, as **Figure 5** above shows, FGC Securities earned a commission of $1,895.39 when the RJM Plan unwound the flex futures transaction.[74]

51. Further, Mr. Wade opines "that the IDBs were used **to create the impression** that Delvian and Roadcraft were engaging with real external IDBs and were transacting on 'market' terms" because the IDBs were "complete pass-through entities which [took] no risk."[75] As explained above, Delvian and Roadcraft did, indeed, engage with real external IDBs. Mr. Wade implicitly acknowledges that Delvian and Roadcraft's transactions with those real external IDBs were on market terms.[76]

52. Mr. Wade claims that the pricing of the futures was "a further indication that none of the transactions were done at arm's-length."[77] Mr. Wade discusses several factors that can affect the pricing of futures contracts.[78] However, this discussion appears to be related to exchange-traded instruments and therefore irrelevant here.

---

[73] Financial Conduct Authority, "Matched Principal Trading," *available at* https://www.handbook.fca.org.uk/handbook/glossary/G3544m.html (last accessed on January 17, 2022) (emphasis added).

[74] Wade Report at p. 104 ("the Bid-Ask Spread Were Ignored by Solo"). Bid-ask spread is an alternative way of earning commission by the IDBs. Under the bid-ask spread system, an IDB would pay a lower price ("bid") for buying an asset from an investor and charge a higher price ("ask") for selling the same asset to another investor. Because IDBs such as FGC Securities for the RJM Plan charged a commission, contrary to Mr. Wade's assertion, they did not need to execute orders using a bid-ask spread. See MPSKAT00066947-51 at MPSKAT00066951, stating: "This letter is to confirm the brokerage rates for FGC Securities, LLC. …

    -    We charge ¼ of a basis point on notional of any stock transactions

    -    We charge ¼ of a basis point on notional of any future transactions"

[75] Wade Report ¶257 (emphasis added).

[76] *See id*.

[77] *Id.* at ¶253.

[78] *Id*. at ¶¶254-255.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

53.  Additionally, Mr. Wade claims that the IDBs involved in the Solo Custodians'
transactions included futures contracts at different expirations trading at the same
prices, and, in support, asserts that pricing of several flex futures transactions related
to Novo Nordisk A/S had the same prices despite different expirations.[79]  I have
reviewed the custodian's statement and found Mr. Wade's assertion to be wrong.
The statement shows the trades on March 20, 2013, of contracts in Novo Nordisk
A/S with September 20, 2013, expiry at prices ranging from DKK 956.01 to DKK
956.08 and with December 20, 2013, expiry at prices ranging from DKK 958.05 to
DKK 958.08.[80]  See **Exhibit 3** for a listing of these trades and prices.  To the extent
that Mr. Wade's assessment of the trading pattern in futures as "highly irregular" is
predicated on this evidence, it is without basis.

54.  Mr. Wade claims that "[i]n my experience, in transactions where futures are used as
hedging instruments in **equity finance transactions**, it is **not market standard** for
the gains and losses on the component elements of trade to net perfectly to zero.
Netting to zero, in this instance, refers to a zero gain or loss for Delvian after
combining the equity purchase, future sale, equity sale, future purchase, net
dividend, stock loan interest, and fees."[81]

55.  Mr. Wade's claim is incorrect for at least the following reasons.

56.  First, so far as I am aware, there is no "market standard" regarding the profit (or loss)
a transaction should have.

57.  Second, Mr. Wade seems to misunderstand the Pension Plan Strategy.  He
incorrectly characterizes the entire transaction as an equity finance transaction and
ignores dividend reclaim and transaction costs in his net profit calculations.

---

[79] *Id.* at ¶257 and n. 211 ("See for example the trades on 20 March 2013 in the JP Morgan statement
(ELYSIUM-01460217). This has 8 trades for the September 20, 2013, expiry single stock future over Novo
Nordisk A/S shares and 8 trades of similar sizes over the December 20, 2013, expiry contract which
coincidentally match the prices on the September 20, 2013, expiry contracts exactly.")

[80] ELYSIUM-01460217.

[81] Wade Report ¶258.  (emphasis added).

**Rebuttal Report of Emre Carr, Ph.D., CFA**

58. It is certainly not market standard to not analyze a trade's profit ignoring payoff from a part of the overall transaction (*i.e.*, dividend reclaim) and transaction costs.

59. Mr. Wade's profit calculations are irrelevant because they are effectively the gross profits (*i.e.*, before transaction costs) for an investor paying taxes at the same rate as the withholding tax, not a tax-exempt entity like Delvian because the calculations ignore a purchaser's tax status.

60. For example, for the Analyzed Transactions in the Initial Carr Report, adding transaction costs to Mr. Wade's profit definition results in a loss for each Analyzed Transaction. See, for example, Table 1 in the Initial Carr Report, when I subtract per share tax reclaim of DKK 324 from the Gross Profit of DKK 340.37 per share, I get Mr. Wade's profit of DKK 16.37 per share (equals DKK 340.37 less DKK 324.00) for the MAERSKB trade by the RJM Plan.[82] From an economic perspective, DKK 16.37 represents the gross profit that an investor with a marginal tax rate of 27% would have made. When I subtract the transaction cost of DKK 17.26 per share shown in Table 1 of the Initial Carr Report, that results in a negative profit because transaction costs of DKK 17.26 exceed the gross profit of DKK 16.37. This result is not surprising and is merely a reflection of the fact that there is no arbitrage opportunity for an investor whose marginal tax rate is the same rate as the withholding tax.

**B.    Securities Lending**

61. To finance the purchase of shares, the pension plans engaged in securities lending. For the Analyzed Transactions, the pension plans lent shares that they purchased on the same day that the stock trades settled and used the cash collateral received in return to pay for the purchased shares.

62. Securities lending transactions are commonly done pursuant to industry-standard agreements like the Global Master Securities Lending Agreement ("GMSLA"), a

---

[82] Initial Carr Report, p. 53, Table 1.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

widely used industry standard template issued by the International Securities Lending Association ("ISLA").[83]

63. For the Analyzed Transactions, the RJM Plan entered into an agreement with Colbrook Ltd., and the Proper Pacific Plan entered into an agreement with Gnosis Capital Ltd.[84]

64. As I noted in the Initial Carr Report, investors sometimes use security lending transactions to finance stock purchases because, as per acceptable market practices, one can obtain more than 100% of the value of the stocks as cash collateral.  Mr. Dubinsky ignores this when he asserts, "the Plans lacked the liquidity and financial wherewithal necessary to purchase the shares that were supposed to be the subject of the Solo Trades."[85]  Mr. Dubinsky also asserts, "[c]onsistent with this pattern, it appears that the offshore stock loan counterparties such as Neoteric Limited were also thinly capitalized and would not have had capital to use as the cash collateral component of the stock loan."[86]  Mr. Dubinsky provides no analyses or citations in support of his assertion.  Absent an analysis of all the transactions that Neoteric Limited did, Mr. Dubinsky's claim is flawed.

65. The pension plans entered into securities lending agreements that conformed to the industry-accepted GMSLA template.[87]

---

[83] ISLA, Global Master Securities Lending Agreement, Version: January 2010, *available at* https://www.islaemea.org/wp-content/uploads/2019/03/GMSLA_2010_amendments_July_2012-1.pdf. (last accessed on January 17, 2022).

[84] Global Master Securities Lending Agreement between Colbrook Ltd. and RJM Capital Pension Plan (MPSKAT00068151-92); Global Master Securities Lending Agreement between Gnosis Capital Ltd. and The Proper Pacific LLC 401k Plan (PROPPACIF00001035-78).

[85] Dubinsky Report ¶214.

[86] *Id.* at ¶215.

[87] GMSLA between Colbrook Ltd. and RJM Capital Pension Plan (MPSKAT00068151-92); GMSLA between Gnosis Capital Ltd. and The Proper Pacific LLC 401k Plan (PROPPACIF00001035-78). As demonstrated in Exhibit 11 of the Initial Carr Report, the GMSLA entered between the pension plans and the borrowers in the Analyzed Transactions were substantially similar to the GMSLA master template.  Exhibit 11 compares the GMSLA used by the RJM Plan to the General Master Securities Agreements (Version: January 2010), the standard industry template.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

66. Yet, Mr. Wade asserts that the "The Terms of the Stock Loan Agreements are Highly Irregular for Multiple Reasons."[88]  As discussed below, Mr. Wade's reasons are flawed or without any basis.

67. First, Mr. Wade states that "[i]f Aquila needed the shares then Delvian would demand margin, and if Delvian were in need to (*sic*) funding then Aquila would demand a haircut."[89]

68. Mr. Wade's assertion that Aquila would have demanded a haircut in this context is inconsistent with the fact that Delvian had executed the transaction as a stock lending transaction, in which the stock lender generally charges margin, not a repurchase agreement (repo) in which the cash lender requires a haircut typically.

69. It is not clear what Mr. Wade means by "[i]f Aquila needed the shares then Delvian would demand margin" because Delvian did demand collateral.[90]  If by margin he is referring to a collateral in excess of 100% of the value of the lent securities,  there is no such requirement.  As I explained in the Initial Carr Report, cash collateral varies from transaction to transaction and is negotiated between the parties:

> *In practice, the cash collateral is often negotiated between parties and depends on firm-specific and collateral-specific factors.  A study reports that 'the 90% of securities lending transactions [in the U.S.] take place with collateral margins ranging from 100% to 111%.'"[91]*

70. Second, Mr. Wade also states, "Delvian appears to have not taken any steps to finance its purchase of DKK 351.9M of CARLB shares for the 5 days between the Trade Date of its Cum-Ex purchase and the Trade Date of the stock loan it used to

---

[88] Wade Report, p. 98.

[89] *Id.* at ¶248.

[90] *Id.* at ¶248.

[91] Initial Carr Report ¶116. (internal citation omitted).  Mr. Wade also asserts, "Aquila gave funding of DKK 586.4698 per share when the value of the collateral was only worth DKK 573.0000 per share.  Aquila provided Delvian with significant margin when it would have been customary instead for Aquila to demand a haircut from Delvian. This is not something which would have been agreed to between arm's-length counterparties." Wade Report ¶249.  In percentage terms, DKK 586.4698 is 102.4% of the DKK 573.00.  As I explained in the Initial Carr Report, the actual cash collateral in an agreement varies, and Delvian could have obtained cash collateral of 105% as per normal stock lending market practices in Europe.  Initial Carr Report ¶¶115-116.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

finance itself. As a thinly capitalized pension fund this is a highly imprudent approach to take if it were not part of the completely pre-ordained set of transactions."[92]

71. The time or steps taken to obtain the financing is irrelevant for determining whether stock purchases were fake. The fact that Delvian did obtain the financing and used that to pay for the shares does not support the conclusion that the trades were fake.[93]

72. Third, Mr. Wade asserts, "I have seen no evidence that any of the counterparties to Delvian were at all concerned about such a large unfunded position or had taken any steps to address what would happen if Delvian's funding stock loan had been declined. There is simply no way that arm's-length counterparties would have dealt with each other on this basis."[94]

73. Without any basis, Mr. Wade seems to assume that the parties to the stock trade knew each other and had visibility into each other's finances. Again, whether a pension plan's counterparty to a stock trade was concerned or not is irrelevant for determining whether stock purchases were fake. The fact that Delvian did obtain the financing and used that to pay for the shares does not support the conclusion that the trades were fake.

74. Fourth, Mr. Wade questions the terms of the stock loan that provided for payments of dividends among the parties, which specify that "Aquila, the borrower, would pay 100% of dividends back to the lender, Delvian"[95] and observes that "this provision

---

[92] Wade Report ¶250.

[93] Mr. Wade also asserts that "[i]n effect, Aquila is providing a thinly capitalized pension fund with complete financing for its 'trading' position and so is effectively at risk of any losses that arise. In my experience, no stock borrower would agree to such terms as it would require the party to ignore all counterparty and market risk inherent in any stock loan transaction." Wade Report ¶247. Without any basis, Mr. Wade seems to assume that Aquila knew that the pension plan was thinly capitalized. If indeed Aquila knew that then it is also likely that Aquila knew that the pension plan had fully hedged its stock purchase and had no market risk. Similarly, Aquila might not have been concerned about the counterparty risk as both Aquila and Delvian were using the same custodian, or because Aquila intended to do another transaction that offset the risk.

[94] *Id.*

[95] *Id.* at ¶246 (citation omitted).

Rebuttal Report of Emre Carr, Ph.D., CFA

appears to be meaningless because there was no need for any manufactured payments during the life of the stock loan."[96]

75.    He himself provides an example of a special dividend where the provision would be applicable.

76.    He also asserts that the dividend terms in the stock lending agreement prove "that the terms of the stock loan transaction were unmoored from the realities of the actual market or any economic considerations."[97]  Mr. Wade ignores that sometimes a company can declare special dividends or that the security lending could extend to the next dividend date.  Therefore, the industry-accepted GMSLA template includes the dividend terms and, as demonstrated in Initial Carr Report, the stock lending done by the pension plans conformed to the GMSLA template.[98]

77.    Finally, Mr. Wade speculates that the stock loan "would have only been undertaken to create the illusion of a dividend to support a reclaim application by Delvian."[99]  He fails to provide any reclaim application that used a stock lending agreement in support of the tax reclaim, and I am aware of none that did.

## V.    BOTH MR. DUBINSKY AND MR. WADE CONSIDER INFORMATION NOT AVAILABLE TO THE PENSION PLANS

78.    Both Mr. Dubinsky's and Mr. Wade's analyses consider information that was not available to the pension plans.  For example, both of these experts rely on:

---

[96] *Id.*

[97] *Id.* at ¶246.

[98]  Initial Carr Report Exhibit 11.  Mr. Wade also asserts that "Aquila would have lost 27% of any such dividend paid as it would not be able to recover any withholding tax and would have had to pay the gross amount."  *Id.* at ¶246, citation omitted.  It seems to me that Mr. Wade is offering an opinion that is based on his interpretation of the tax related clauses in the GMSLA template.  I am not a tax law expert.  However, it seems to me that Mr. Wade's interpretation might be incorrect as he ignores the fact that, under the GMSLA, payment could be net of withholding tax depending on the Applicable Law.   In support of his assertion, Mr. Wade highlights Aquila's residency without explaining its relevance to the question of whether dividend payments made pursuant to the GMSLA would have taxes withheld in the first instance.

[99] *Id.* at ¶246.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

    a.    Solo account statements at Société Générale, a sub-custodian, and sworn affidavits from two other sub-custodians, JP Morgan Chase and Skandinaviska Enskilda Banken AB,[100]

    b.    Various transactions by the counterparties to the pension plans that did not involve the pension plans.[101]

79.    Mr. Dubinsky suggests that the pension plans received the "very same shares" that the plans lent because the pension plans' lent those shares to a stock loan intermediary that loaned those shares to the party that had sold those shares to the pension plans in the first place.[102]

80.    First, as discussed in the Initial Carr Report, Danish shares are dematerialized, meaning that there are no physical paper certificates of shares, and that the shares exist "only" as electronic book entries that track ownership.[103]  Further, the shares are fungible.  As a result, the concept of the "same shares" being transferred through multiple holders does not make sense.

81.    Second, Mr. Dubinsky does not suggest that he has examined all the transactions (*e.g.*, other trades and borrowing or lending) done by the stock borrowers in these transactions.  For example, the stock borrowers may have also sold or lent shares to other parties and/or borrowed additional shares in addition to the specific trades that Mr. Dubinsky identifies.  Absent such an examination of other transactions, it is incorrect to conclude, as Mr. Dubinsky does, that the stock trade counterparty had no other shares, or that "the same shares" came back to the pension plans.  In particular, due to the prevalence of dividend arbitrage strategies, share trading volumes are high around ex-dividend dates – whether due to Cum-Cum or Cum-Ex trading or any

---

[100] Dubinsky Report ¶¶134-137; Wade Report ¶234-235.

[101] Dubinsky Report, Figures 9, 14, 15, 19, 20, 25, 26, 27, and 28; *see also* Wade Report, Figure 11.

[102] Dubinsky Report ¶17.

[103] Initial Carr Report ¶29, *also see* Regulation (EU) No 909/2014 Of The European Parliament And Of The Council of 23 July 2014 on improving securities settlement in the European Union and on central securities depositories and amending Directives 98/26/EC and 2014/65/EU and Regulation (EU) No 236/2012, Art. 2.1(4)  ("dematerialised form' means the fact that financial instruments exist **only** as book entry records") (emphasis added).

other form of dividend strategies.  The party to whom the pension plans lent shares could have traded with many other parties on those dates.

82.  Therefore, the purported evidence that Mr. Dubinsky proffers regarding the Solo Custodians' conduct is incomplete for evaluating the pension plan trades.  I refer to the evidence as purported because the Solo Custodians are not parties in this matter and, therefore, cannot respond to Mr. Dubinsky's claims.

83.  Further, both of the SKAT Experts fail to demonstrate that the pension plans knew that "Solo never held any actual Danish securities."[104]

84.  The SKAT Experts also do not provide any evidence demonstrating that the pension plans knew of all transactions (and identities of parties in those transactions), including transactions that did not involve the pension plans.

## VI.    CUM-CUM AND CUM-EX TRANSACTIONS LEAD TO THE SAME ECONOMIC EXPOSURE FOR A PENSION PLAN; SUBSTITUTE DIVIDEND PAYMENTS DO NOT MEAN THAT A TRANSACTION IS FABRICATED

85.  Mr. Wade categorizes dividend arbitrage transactions of the type pursued as part of the Pension Plan Strategy into two categories: (i) "Cum-Cum," and (ii) "Cum-Ex."[105]

86.  Mr. Wade considers the Cum-Cum trades as "legitimate," noting that in those trades, the custodian or one of its clients "did in fact obtain a **real** dividend."[106]  Mr. Wade,

---

[104] Wade Report ¶225. As discussed in §VIII, given the offsetting trades by Solo's clients, the net shareholdings in Solo's sub-custodian account do not demonstrate that the pension plan trades were fake.

[105] *Id.* at ¶162 ("Separately, I have reviewed various other contemporaneous transactions undertaken by ED&F Man that involved the transfer of shares which settled prior to the Record Date… I will refer to these transactions as 'Cum-Cum' transactions."); *id.* at ¶79 ("A so-called Cum-Ex transaction is one where the transaction terms are agreed before the Ex-Dividend Date, but the settlement terms are modified so that settlement of the transaction is agreed to be after the Record Date.").  I note that in Cum-Ex transactions the settlement terms are not "modified" but are selected and agreed upon by the parties.

[106] As per Mr. Wade, "A real dividend involves the direct payment of a dividend from a share issuer, and results from being a shareholder of record on the dividend Record Date." *Id.* at ¶70 Mr. Dubinsky calls the dividend sourced from an issuer an "actual dividend."  Dubinsky Report ¶16.  I note that these definitions are imprecise since, as discussed in the Initial Carr Report, dividends received by the holders of record are not received directly from the stock issuer, but from the custodians and flow from a chain of custody that began at the issuer.  *See* Initial Carr Report ¶125.

*See also*, Wade Report ¶162 (explaining Cum-Cum transactions "**are transactions under which ED&F Man or one of its clients did in fact obtain a real dividend.**) (emphasis added).

**Rebuttal Report of Emre Carr, Ph.D., CFA**

however, considers Cum-Ex transactions through the Solo Custodians as "fabricated" because, among other things, the "The Solo Pension Plans' counterparties and other parties to the transactions **did not receive a real dividend**."[107]

87.    As discussed below, a transaction is not "fabricated" simply because the investor received an amount labeled a substitute, rather than "real" dividend payment, as Mr. Wade asserts.[108]

88.    Mr. Wade does not describe the Cum-Cum transactions he analyzed in detail. His report suggests that, like the Pension Plan Strategy, an investor engaging in a Cum-Cum transaction bought shares at cum-dividend prices (*i.e.*, before the ex-dividend date) and, thereby, obtained claim to an amount equal to the forthcoming dividend paid by the underlying stock.[109] Concurrently, the investor hedged price risk through a derivative, *e.g.*, a future or forward contract.[110]

89.    As I explained in the Initial Carr Report, an investor obtains economic exposure to a stock when the purchase occurs and not when the trade settles. Both in a Cum-Cum and a Cum-Ex trade, an investor buys a stock at the cum-dividend price before the ex-dividend date, and, thereby, obtains immediate economic exposure to changes in the stock price and a claim to an amount equal to the forthcoming dividend. Clearing and settlement are post-trade operations that do not alter the investor's economic exposure.[111]

---

[107] *Id.* at ¶16 (emphasis added).

[108] *Id.* at ¶16.

[109] Mr. Wade implicitly acknowledges that, typically, the seller in the Cum-Cum Transactions was a short seller as he explains that "the pricing of these [Cum-Cum] transactions necessarily involves the economic compensation of a third-party financial institution from which the shares were obtained, **most often through a stock loan that settled prior to the Record Date**." *Id.* at ¶162 (emphasis added).

[110] *Id.* at Appendix F.

[111] Initial Carr Report ¶47 ("Together, clearing and settlement form a process that ensures that sellers get payment for the sold securities and buyers get delivery of the purchased securities.") An investor's economic exposure is only impacted if a custodian fails to settle the purchased securities. I discuss the trade settlement in Section VIII.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

90. Cum-Cum and Cum-Ex trades differ in the sense that stock purchases in a Cum-Cum transaction settle **before** the record date, whereas the stock purchases settle **after** the record date in a Cum-Ex trade.[112]

91. As a matter of economics, an investor's purchase of shares at cum-dividend prices reflects the purchaser's entitlement to receive an amount equal to the dividend payment (net of withholding tax, if any).  As discussed in my opening report, the Plan accounts received dividend payments (net of withholding taxes) from their custodians.[113]  **Figure 6** below shows the "Dividend Credit Advice" that the RJM Plan received from Solo for its April 2013 trade in MAERSKB stock.

---

[112] Wade Report ¶79, stating that a Cum-Ex "transaction is a Cum-Dividend sale with Ex-Dividend settlement, hence the name Cum-Ex."  I use the term Cum-Ex as used by Mr. Wade in his report.

[113] Initial Carr Report ¶128.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

**Figure 6: Dividend Credit Advice from Solo to the RJM Plan**[114]



Figure content:

Solo Capital

4 Throgmorton Avenue
London EC2N 2DL

**DIVIDEND CREDIT ADVICE**
**Issue Date: 17th April 2013, Issue No: 285**

RJM Capital Pension Plan
1010 Fifth Avenue
Apt 1D
New York
NY 10028
United States of America

**Date: 17th April 2013**

Dear Sirs,

Please be advised that we have credited your account RJM01, for the value date of 17th April 2013. This payment represents the dividend as shown below:

| | |
|---|---|
| **Security Name:** | AP MOELLER-MAERSK A/S - B SHARES |
| **Sedol:** | 4253048 |
| **ISIN:** | DK0010244508 |
| **Pay Date:** | 17th April 2013 |
| **No of Shares:** | 10,400 |
| **Gross Dividend:** | DKK 12,480,000.00 |
| **Tax:** | DKK 3,369,600.00 |
| **Net Dividend:** | DKK 9,110,400.00 |

Name: Jas Bains
Solo Capital Partners LLP

Solo Capital Partners LLP is authorised and regulated by the Financial Conduct Authority of the United Kingdom (FCA Registration Number 566533, Company Number OC367979, VAT Registration Number 123 3462 46)

CONFIDENTIAL                                                          WH_MDL_00268445

---

[114] WH_MDL_00268445.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

92. Contrary to Mr. Wade's assertion, there is nothing wrong *per se* with a Cum-Ex transaction and the Cum-Ex nature of the trade does not make the transaction fictitious simply because the dividends received in the transaction are substitute dividend payments.  For example, as noted earlier, a Cum-Cum transaction can become a Cum-Ex transaction when there is a settlement failure and thus the trade does not settle on or before record date.  As Mr. Wade acknowledges, "[a]cross equity and other financial markets numerous settlements fail daily" and "failed trades are simply reattempted the next day and generally settle a maximum of one or two days later."[115]  Mr. Wade acknowledges that a Cum-Cum trade will become a Cum-Ex trade when there is a settlement failure.[116]

93. According to Mr. Wade, there is no problem if a "legitimate" Cum-Cum trade has a settlement failure and becomes a Cum-Ex trade.  I agree.  And further, if a Cum-Ex trade is legitimate when it happens as a result of a settlement failure, it is equally legitimate when it happens by design.  Relatedly, irrespective of whether a payment is called a substitute dividend or real dividend, an investor receives the same amount.

94. Similarly, if the seller in a Cum-Ex transaction is a short seller that borrowed shares before the record date, the buyer will still receive substitute dividend payments.  The short seller will also have to pay substitute dividends to the security lender as well.  In other words, for the same shares, two investors will receive substitute dividends.  It will be incorrect to say that the stock trade or loan is fake or that either of these substitute dividend payments is fake even though the company paid dividends only once for the shares.

95. Mr. Wade also states that "[t]here was no economic requirement for the contracts to be priced on a cum-dividend basis when they in fact were ex-dividend purchase

---

[115] Wade Report ¶82 ("Settlement failure can occur because banks or custodians make errors which need to be corrected or because counterparties default. … In nearly all circumstances, failed trades are simply reattempted the next day and generally settle a maximum of one or two days later.").

[116] *Id.* at p. 33 discussing "Origins of "Cum-Ex" Transactions Which Resulted from Settlement Fails." *See also id.* at ¶83 ("It is my understanding that the earliest examples of Cum-Ex transactions arose as a result of accidents due to settlement failures.").

**Rebuttal Report of Emre Carr, Ph.D., CFA**

contracts."[117]  However, the pension plans purchased shares at cum-dividend prices and, thus, they were entitled to receive the dividends.  Whether those were "real" dividends or substitute dividends made no difference to the economics of the trades.  As discussed above, even a Cum-Cum trade can become a Cum-Ex trade under some circumstances.[118]

96.  Mr. Wade also states that "market participants were highly skeptical of situations that appeared to suggest that a dividend compensation payment was the same as a real dividend."[119]  Even if this statement without any citation were true, skepticism does not mean that investors do not engage in such transactions or that there is anything "fake" about them.  Furthermore, I note that any dividend payments made in securities lending transactions, from the borrower to the lender, are by default substitute dividend payments.  Securities lending transactions involving such substitute dividend payments are quite common, despite any "skepticism" of such payments that Mr. Wade asserts.  There are trillions of euros of securities lent each year,[120] and, in fact, as discussed in the Initial Carr Report, securities lending increases around dividend record dates.[121]

97.  Citing to the U.K. Manufactured Overseas Dividend (tax) rules, Mr. Wade asserts that "it was well understood by market participants that there was a significant difference between receiving a real dividend and receiving a dividend compensation

---

[117] *Id.* at ¶90.

[118] Mr. Wade also asserts that "the Cum-Ex transactions were priced on average at a significantly lower rate compared to the Cum-Cum transactions which required market-level compensation payments because the shares were lent over Record Dates."  *Id.* at ¶163.  I am unable to verify Mr. Wade's claims about "All-In" Dividend Sourcing Cost presented in Appendix F because, unlike his Appendix C, he does not provide the underlying data or a specific source that would allow me to replicate his Appendix F.  I understand from counsel that, despite my request, SKAT has refused to provide the data, and therefore, in my opinion, Mr. Wade's evidence in Appendix F is nothing more than his *ipse dixit.*

[119] *Id.* at ¶76.

[120] *See, e.g.*, ISLA, "Securities Lending Market Report," March 2021, p. 13, *available at* https://www.islaemea.org/assets/smart-pdfs/isla-securities-lending-market-report-march-2021/ (last accessed January 31, 2022)

[121] *See* Initial Carr Report ¶108.

payment."[122]  First of all, Mr. Wade does not explain why the U.K. Manufactured Overseas Dividend (tax) rules are relevant when the securities at issue are Danish ones.  Second, he does not explain to what the "significant difference" refers, and why it demonstrates that the pension plans trades were allegedly fake.  To the extent Mr. Wade is referring to the different tax treatment, the impact would depend on the tax status of the investor and Mr. Wade does not explain why that would be relevant for a tax exempt investor like pension plan.

## VII.    SKAT EXPERTS' REPEATED ASSERTIONS OF PURPORTEDLY "CIRCULAR" TRANSACTIONS DO NOT DEMONSTRATE THAT THE PENSION PLAN TRANSACTIONS WERE "FAKE"

98.   Mr. Dubinsky refers to the Solo trades as "closed loop, circular transactions,"[123] while Mr. Wade asserts that "[t]he circular nature of the Solo trades with Delvian means that there was no requirement for shares or cash; the purported trades were completely fake."[124]

99.   Mr. Dubinsky defines the term "loop" as a "circular trading pattern involving (1) ostensibly the purchase of Danish equity securities, (2) the use of purported stock loans to finance the purchases by Plans that otherwise had no money, and (3) purported forward/futures hedging transactions, all related to certain Danish equities structured around their respective dividend payment dates."[125]

100.   This description does not point to a loop but suggests that Mr. Dubinsky disagrees that the pension plans actually executed the stock purchases, futures and forwards hedges, and stock loans.  Mr. Dubinsky inserts "ostensibly" and "purportedly" in his description of these transactions and apparently refers to them as a "loop" based on

---

[122] Wade Report ¶73 (citing to U.K. guidance on manufactured dividend rules from Her Majesty's Revenue and Customs Corporate Finance Manual, published April 16, 2016, updated November 23, 2021).

[123] Dubinsky Report ¶16.

[124] Wade Report ¶16.

[125] Dubinsky Report ¶147.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

his assessment of additional transactions in which other parties (such as the executing broker and lending counterparties) engaged.[126]

101. Both Mr. Wade and Mr. Dubinsky fail to articulate what they mean by a circular transaction and fail to explain what exactly is circular in the figures present and why the purportedly circular nature of the transactions establishes that the trades were fake.[127] For example, Figure 15 in the Dubinsky Report shows a Solo trade made by the Bernina Pension Plan, in which it purchases shares of Carlsberg stock from D.D.C. Cayman (through executing broker FGC Securities) and lends shares of Carlsberg stock to Colbrook, Ltd.[128] Presumably this is a circular trade according to Mr. Dubinsky as he draws arrows connecting parties to various transactions in a way that they form a circle.

102. The Bernina Pension Plan's transactions of 1) buying shares through FGC Securities and 2) lending shares to Colbrook, Ltd. do not make a "loop." However, the Dubinsky Report goes on to state that Colbrook, Ltd. loaned shares to D.D.C. Cayman, which is the same counterparty from which the Bernina Pension Plan purchased shares (through FGC Securities). This, the Dubinsky Report asserts in Figure 15, is a "loop."[129] **Figure 7** below is a replication of the transactions depicted in the figure.

---

[126] Mr. Dubinsky's assessment is incomplete as it does not consider all the transactions that financial intermediary might have made.

[127] *See, e.g.*, Dubinsky Report, Figure 15, and Wade Report, Figure 2.

[128] Dubinsky Report ¶¶158-175 and Figure 15.

[129] *Id.* at Figure 15.

Rebuttal Report of Emre Carr, Ph.D., CFA

**Figure 7: Replication of Dubinsky Report Figure 15 (Bernina Pension Plan Transaction in Carlsberg Stock)**



103. The role that Colbrook, Ltd. plays in the figure --borrowing shares from one party and lending shares to another-- is no different from a similar intermediary function performed by the securities lending desks of other broker-dealers.  For example, the Northern Trust security lending desk could have been the stock loan intermediary instead of Colbrook, Ltd.

104. Further, from an economic perspective, the transaction would result in the same economic exposure for the Bernina Pension Plan whether D.D.C. Cayman owned the shares it sold or borrowed them from a different party.  **Figure 8** below depicts a transaction where D.D.C. Cayman owned, as of trade date, the shares it sold and Colbrook, Ltd. lent shares to a different party.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

**Figure 8: Replication of Dubinsky Report Figure 15 with Additional Borrowing Party**



105. This alternative form of the transaction involves what Mr. Dubinsky might call "actual Carlsberg shares." This transaction is identical to that depicted in Figure 15 to the Dubinsky Report in the sense that, in both transactions, the Bernina Pension Plan purchased shares through FGC Securities and lent shares to Colbrook, Ltd.

106. **Figure 9** below shows another alternative version of the transaction that appears identical from an economic perspective: D.D.C Cayman borrows shares from an additional party.

Rebuttal Report of Emre Carr, Ph.D., CFA

**Figure 9: Replication of Dubinsky Report Figure 15 with Additional Borrowing Party and Additional Lending Party**



107. The Dubinsky Report acknowledged that FGC Securities LLC acted as an executing broker, suggesting that this act created "an air of legitimacy to the trade."[130] Certainly, the pension plans' trading through a broker such as FGC Securities LLC was a customary practice and not anything that would indicate that the trade confirmations from the broker were "fake."

108. In short,  the SKAT Experts' repeated assertions of purportedly "circular" transactions do not demonstrate that the pension plan transactions were "fake."

**VIII.  GIVEN THE OFFSETTING TRADES BY SOLO'S CLIENTS, THE NET SHARE HOLDINGS IN SOLO'S SUB-CUSTODIAN ACCOUNT DO NOT DEMONSTRATE THAT THE PENSION PLANS DID NOT EXECUTE TRADES IN DANISH STOCKS**

109. Mr. Dubinsky describes his attempts to confirm that Solo had shares of the Danish companies traded in the Pension Plan Strategy[131] and concludes that: "I am unaware

---

[130] *Id.* at ¶162.

[131] *Id.* at ¶¶135-136.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

of any credible explanation for the lack of Danish holdings on behalf of the Solo
Custodians at the sub-custodians identified by Shah other than that no such
shareholdings ever existed."[132]

110. First of all, I note again that an investor obtains immediate economic exposure when
a stock purchase occurs. Because the pension plans bought shares at the cum-
dividend prices, they obtained immediate economic exposure to changes in the stock
price and a claim to an amount equal to the forthcoming dividend as soon as the
trade execution was confirmed by the IDBs. Clearing and settlement are post-trade
operations that do not alter the economic exposure of the investor unless a custodian
fails to settle the purchased securities. Mr. Dubinsky does not provide any evidence
that the Solo Custodians failed to settle the trades.

111. Further, examining the Danish holdings on behalf of the Solo Custodians at the sub-
custodians is irrelevant for assessing the validity of purchases that the pension plans
made. This is because if the Solo Custodians' settlement of the trades involved the
settlement of offsetting trades on the same date then it would not require sourcing
shares externally as the trades netted to zero.

112. Consider the transaction described in Figure 15 to the Dubinsky Report, in which the
Bernina Pension Plan purchased 600,000 shares of Carlsberg through FGC
Securities.[133] The Bernina Pension Plan lent shares to Colbrook Ltd. to finance the
transaction, which, according to Mr. Dubinsky, then lent shares to D.D.C. Cayman to
cover its sale of shares to the Bernina Pension Plan.[134] Mr. Dubinsky claims that "I
have seen no evidence that any of the parties to this transaction loop ever actually
owned shares."[135] Mr. Dubinsky does not explain how he arrives at the conclusion

---

[132] *Id.* at ¶137. As discussed above, it is not clear which sub-custodians are relevant and Mr. Dubinsky does not
appear to have reviewed records from all sub-custodians.

[133] Dubinsky Report, Figures 10 and 15.

[134] *Id.* at Figures 14 and 15.

[135] *Id.* at ¶173.

that no one "actually owned" the Carlsberg shares or how he is qualified to make a legal conclusion about what a party did or did not own.

113.    Furthermore, as Mr. Wade acknowledges in his report, a custodian can settle multiple trades simultaneously, and net settle offsetting transactions.[136]  Through application of net settlement, if two or more clients of a Solo Custodian engage in offsetting trades in a Danish stock (*e.g.*, a buy and a sell order) settling on the same day, the custodian can net all the trades.  If the trades involve the same number of shares, the custodian's holdings will not change after these offsetting trades.

114.    Thus, the lack of Danish holdings on behalf of the Solo Custodians at the sub-custodians identified by Mr. Shah cannot demonstrate that Bernina did not purchase Carlsberg shares.

115.    Contrary to Mr. Wade's assertion, "the ability to net settle offsetting" transactions is not theoretical.  Denmark's CSD, VP's settlement model allows for net simultaneous settlement of funds and securities.[137]

116.    In fact, the settlement by a custodian without external sourcing of securities is known as internalized settlement and is quite common.  EU Regulations issued in July 2014 specifically recognize internalized settlement.[138]  A report issued by the European Securities and Markets Authority ("ESMA") notes that "[t]he majority of

---

[136] Wade Report ¶189.i discussing simultaneous settlement.  Mr. Wade also acknowledges that it is possible to settle trades by netting when he notes: "Notwithstanding the theoretical ability to **net settle offsetting DVP transactions**..."  Wade Report ¶238. (emphasis added)

[137] VP uses DvP Model 3 (for its settlement system) that also allows for net simultaneous settlement of funds and securities.  *See, e.g.*, BIS, "Glossary: DvP Model 3," *available at* https://www.bis.org/cpmi/publ/d00b.htm?&selection=125&scope=CPMI&c=a&base=term (last accessed on January 17, 2022) and Banque de France, "Payments and Market Infrastructures in the Digital Era," January 2021, Chapter 13, p. 220, *available at* https://publications.banque-france.fr/en/economic-and-financial-publications/book-payments-and-market-infrastructures-digital-era (last accessed January 17, 2022).

[138] Regulation (EU) No 909/2014 Of The European Parliament And Of The Council of 23 July 2014 on improving securities settlement in the European Union and on central securities depositories and amending Directives 98/26/EC and 2014/65/EU and Regulation (EU) No 236/2012, Chapter IV, "Internalised Settlement."

**Rebuttal Report of Emre Carr, Ph.D., CFA**

internalised settlement instructions (based on their number) concerns equities."[139] The same ESMA report shows that equity trades worth trillions of Euros were settled through internalized settlement.[140]

117. Financial intermediaries use a similar practice called "internalization, in which long and short positions from a dealer's client pool are matched **to reduce net funding requirements**."[141]  Internalization of trades is common: one estimate is that 40% of short positions in the U.S. are covered internally by dealers.[142]  Discussing internalization, a Bank of England Policy Statement notes:

> *4.19 Internalisation: If a PB [Prime Broker] has two clients that are taking opposite positions on the same asset (one long, the other short), the PB may internally net these amounts to avoid having to fund the positions elsewhere: a client short position is therefore funding a client long position.  Liquidity risk arises if one client wishes to withdraw from their transaction: the PB will either need to find additional funding or will need to purchase or borrow the asset to match the remaining transaction.*[143]

118. In other words, the internalization of transactions (*i.e.*, settling the opposite positions on the same asset and using a client's short position for "funding a client long

---

[139] ESMA, "Report to the European Commission: CSDR Internalised Settlement," November 5, 2020, p.23 *available at* https://www.esma.europa.eu/sites/default/files/library/esma70-156-3729_csdr_report_to_ec_-_internalised_settlement.pdf (last accessed on January 31, 2022).

[140] *Id.* at p. 25 reporting that total internalized settlement in equities was, at a minimum, 15.8 trillion euros  per quarter for the period from the second quarter of 2019 through the third quarter of 2020.

[141] Macchiavelli, Marco, and Luke Pettit, "Shining a Light on the Shadows: Dealer Funding and Internalization," Board of Governors of the Federal Reserve System, December 20, 2019, *available at* https://www.federalreserve.gov/econres/notes/feds-notes/dealer-funding-and-internalization-20191220.htm (last accessed on January 31, 2022) (emphasis added).

[142] *Id*.

[143] Bank of England Prudential Regulation Authority, "Statement of Policy, Pillar 2 Liquidity," June 2019 Updating February 2018, p. 10, *available at* https://www.bankofengland.co.uk/-/media/boe/files/prudential-regulation/statement-of-policy/2019/pillar-2-liquidity-sop-update-june-2019.pdf?la=en&hash=78618B0A466B17BCF86952AAD06AC14AEE3E4FDE (last accessed on January 31, 2022)

**Rebuttal Report of Emre Carr, Ph.D., CFA**

position") is a well-recognized and accepted practice as per the Bank of England Policy statement.[144]

119.  Relatedly, Mr. Wade asserts that "[i]n my experience, a custodian would only issue tax vouchers which totaled its combined net long position, not the long side of its net flat, or equal and offsetting long and, short positions."[145]  Mr. Wade seems to opine on what a custodian is required to do under tax regulations without citing any applicable authority.  If there are requirements or practices associated with the issuance of tax vouchers to a client relating to taxes associated with a particular tax jurisdiction, it seems that they would be based on the laws and requirements of that particular jurisdiction.

120.  Mr. Dubinsky claims that "[m]ost of the proceeds from the tax reclaim payments went to Solo Capital or affiliated entities."[146]  In my opinion, the division of the proceeds post transaction is irrelevant for assessing whether the trades were fake because the parties could agree to split the proceeds in a particular way irrespective of whether the transactions were fake or not.

## IX.  CONCLUSION

121.  For all of the reasons discussed in this report, I find that the core claim of the SKAT Experts that the trading at issue in this case was "fake" or "fictitious" is not supported by their reports.

<div align="center">***************</div>

---

[144] *Id.* at 4.16 ("Prime brokerage services allow investors, usually hedge funds, **access to securities lending, leveraged trade executions, and cash management**, among other things. Prime brokers (PB) **act as intermediaries to facilitate investor positions**, but do not generally assume the risk of the transactions. They do this by sourcing funding for the transactions and, where possible, the maturity of this funding will be matched to the maturity of the client transaction.")

[145] Wade Report ¶237.

[146] Dubinsky Report ¶16.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

My work is ongoing and my opinions are subject to revision based on new information, which subsequently may be provided to or obtained by me.

_____

Emre Carr, Ph.D., CFA

February 1, 2022