**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

In re

CUSTOMS AND TAX ADMINISTRATION
OF THE KINGDOM OF DENMARK
(SKATTEFORVALTNINGEN) TAX REFUND
SCHEME LITIGATION

This document relates to case nos.:
18-cv-07828; 19-cv-01785; 19-cv-01867; 19-cv-
01893; 19-cv-01781; 19-cv-01783; 19-cv-01866;
19-cv-01895; 19-cv-01794; 19-cv-01865; 19-cv-
01904; 19-cv-01798; 19-cv-01869; 19-cv-01922;
19-cv-01800; 19-cv-01788; 19-cv-01870; 18-cv-
07827; 19-cv-01791; 19-cv-01792; 19-cv-01928;
19-cv-01926; 19-cv-01868; 18-cv-07824; 19-cv-
01929; 19-cv-01803; 19-cv-01806; 19-cv-01906;
19-cv-01801; 19-cv-01894; 19-cv-01808; 19-cv-
01810; 19-cv-01809; 18-cv-04833; 19-cv-01911;
19-cv-01898; 19-cv-01812; 19-cv-01896; 19-cv-
01871; 19-cv-01813; 19-cv-01930; 18-cv-07829;
18-cv-04434; 19-cv-01815; 19-cv-01818; 19-cv-
01931; 19-cv-01918; 19-cv-01873; 19-cv-01924;
19-cv-10713; 21-cv-05339.

MASTER DOCKET

18-md-2865 (LAK)

---

**PLAINTIFF SKATTEFORVALTNINGEN'S REPLY MEMORANDUM OF LAW IN**
**SUPPORT OF ITS MOTION TO EXCLUDE THE TESTIMONY OF DR. EMRE CARR**

HUGHES HUBBARD & REED LLP
William R. Maguire
Marc A. Weinstein
Neil J. Oxford
Dustin P. Smith
Gregory C. Farrell
One Battery Park Plaza
New York, New York 10004
(212) 837-6000

*Counsel for Plaintiff Skatteforvaltningen*
*(Customs and Tax Administration of the*
*Kingdom of Denmark)*

## <u>TABLE OF CONTENTS</u>

Page

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT .............................................................................................................................2

   I.     Dr. Carr's opinions concerning net settlement are unreliable.........................................2

   II.    Dr. Carr's opinions concerning net settlement are irrelevant and prejudicial. ...............7

   III.   Dr. Carr's opinions on what SKAT's experts demonstrated about defendants' knowledge are inadmissible. .........................................................................................10

CONCLUSION ........................................................................................................................10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Customs & Tax Admin. of the Kingdom of Denmark (SKAT) Tax Refund Litig.*, No. 18-CV-04051, 2023 WL 8039623 (S.D.N.Y. Nov. 20, 2023) ............................7, 8

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 118 S. Ct. 512 (1997) ........................................3

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167 (1999) ...........................6

*In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396 (S.D.N.Y. 2016) ...................2

*Sec. & Exch. Comm'n v. Lek Sec. Corp.*, 370 F. Supp. 3d 384 (S.D.N.Y. 2019)..........................10

*United States v. Gatto*, No. 17-CR-0686 (LAK), 2019 WL 266944 (S.D.N.Y. Jan. 17, 2019)..........................................................................................7

Plaintiff Skatteforvaltningen ("SKAT") respectfully submits this reply memorandum of law in support of its motion to exclude defendants' expert Dr. Emre Carr's proposed testimony.

## PRELIMINARY STATEMENT

Defendants have failed to meet their burdens to show that Dr. Carr's net settlement opinion, *i.e.*, that the Solo custodians "net settled" billions of dollars in trades without a single share or cent, is both reliable and relevant.

Nothing in the Bank of England policy statement or article by Federal Reserve Bank of New York representatives that defendants tout substantiates Dr. Carr's opinions. The practice of "internalization," whereby a bank sources funding or shares for its customers' trades internally, requires that the bank or its customers already have the requisite cash or shares needed to settle the trades on hand at the bank. As such, if neither the Solo custodians nor any of their customers had the cash or Danish shares to settle the defendants' trades, the Solo custodians could not have, as Dr. Carr contends, "internalized" the trades. And, certainly, the Solo custodians could not thereby have created shares and dividends the underlying company never issued.

The Rules of the London Stock Exchange likewise provide no support for Dr. Carr's opinions because those rules plainly are inapplicable to defendants' over-the-counter trades. And defendants offer no cogent reason to ignore the U.K. Financial Conduct Authority's conclusion that purported "net settlements" of Solo's circular trades without any cash or shares is abusive, not a standard or routine practice as Dr. Carr opines.

 Nor do defendants provide any new arguments that would warrant the Court reconsidering the Danish law findings in its summary judgment decision that the *nemo dat* principle governs the plans' purported purchases of shares. Under *nemo dat*, none of the parties to the purported "trades" could have transferred any shares that they did not own. Thus, Dr.

Carr's opinions that the Solo custodians could have settled the defendants' "trades" without any shares has no bearing on the dispositive factual question whether the sellers from whom the plans supposedly purchased the shares ever had or delivered any such shares. Accordingly, his opinions are irrelevant to the question whether the defendants' representations of share ownership and dividend receipt in their tax refund claims could have been true. Similarly irrelevant is Dr. Carr's conclusion that the defendants' "trading" resulted in the plans having "economic claims" to billions of dollars in dividends—by which he means that they endowed each other with contractual claims to shares that none of the parties had, not any ownership rights as against the company that issued actual shares or against any third party. In any event, defendants do not dispute that this conclusion hinges on his inadmissible opinions that the Solo custodians "net settled" the trades.

Finally, Dr. Carr's opinions about what SKAT's experts failed to prove with respect to defendants' knowledge are irrelevant and inadmissible because SKAT's experts did not, and could not, offer opinions on such matters.

## ARGUMENT

### I.    Dr. Carr's opinions concerning net settlement are unreliable.

Defendants miss the point in arguing that Dr. Carr "cites to abundant authority" in his reports. (Defs. Br. 4-7.) "Quantity does not equal reliability" and defendants "fail to show how" any of the materials Dr. Carr cites "reliably substantiate" his "views" that the Solo custodians settled the defendants' supposed trades without cash or shares from any source. *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 455 (S.D.N.Y. 2016).

No doubt it is an "unremarkable proposition" that a custodian can in certain circumstances "engage in net settlement and settlement internalization to settle equal and offsetting transactions without going to the market to obtain shares." (Defs. Br. 4.) But that

anodyne description of Dr. Carr's proposed testimony elides the part that SKAT contends is unreliable, *i.e.*, that the Solo custodians could have engaged in "net settlement" or "settlement internalization" without any shares at all, thus creating out of thin air virtually unlimited amounts of new shares and dividends never issued by the company. And for that remarkable proposition, the "analytical gap between" the sources on which Dr. Carr relies and "the opinion proffered" is "simply too great." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 519 (1997).

The "internalization" discussed in the Bank of England Prudential Regulation Authority's Statement of Policy and the Federal Reserve Bank of New York article on which Dr. Carr relies and that defendants highlight requires both shares and cash to settle trades and thus provides no support for Dr. Carr's opinions. (Defs. Br. 4-5.) As the name implies, "internalization" is "the concept" that a bank or prime broker, "in some cases, can source financing for a customer internally, without the need to attract additional funding from the external marketplace," *e.g.*, "by using offsetting trading positions between two clients or between clients and the dealer bank to 'finance' each other." (Weinstein Decl. Ex. 18 at 9.)

"For example, the bank may make a 'margin loan' to one customer, lending cash to finance the customer's security purchase, with the customer offering the purchased security as collateral for the bank loan," while "[a]nother customer may request to borrow the same security to establish a short position, offering cash to the bank as collateral for the loan." (*Id.* at 3.) In those circumstances, the bank can internalize the trades because it has already existing actual cash and securities positions that it can use to offset against each other. "The two customers' pledges of collateral provide the bank with the resources to fulfill both customers' demands for

borrowing." (*Id.*)[1]  Or as the Bank of England puts it, "if a [prime broker] has two clients that are taking the opposite positions on the same asset (one long, one short), the [prime broker] may internally net these amounts to avoid having to fund the positions elsewhere: a client short position is therefore funding a client long position."  (Weinstein Decl. Ex. 16 at 14.)  "By fulfilling the collateral needs of one party (either in the form of cash or securities) with an *already existing* source of that collateral, the dealer bank can avoid additional financing transactions."  (Weinstein Decl. Ex. 18 at 5 (emphasis added).)

Dr. Carr and defendants misunderstand this concept of "internalization" in contending it means that the Solo custodians could have settled the defendants' "trades" without the shares or cash traded.  The Solo custodians could not have internally sourced cash for share purchases or shares for short sales where none of its customers had any cash or shares to source.  Nor does Dr. Carr even contend that the Solo custodians internally sourced the funding or securities for the plans' share purchases or the sellers' short sales, *e.g.*, by providing the plans margin loans funded by collateral pledged by the short sellers.  Rather, Dr. Carr's opinion is that the plans funded their share purchases by borrowing money ultimately from themselves that they did not have in the first place.  And that the short sellers sourced the shares by borrowing the same shares they sold the plans that they likewise never had to begin with.  The point that defendants miss is that the Bank of England and the Federal Reserve describe the use to which a bank can

---

1.  *See id.* at 9-11 ("Customer A deposits $500 of cash into its brokerage account . . . and then borrows $500 from the dealer bank to acquire a $1,000 long position in Security Q . . . .  Customer A pledges the acquired securities as collateral for the loan.  As Customer A purchases the securities on margin, the dealer gains rehypothecation rights over the collateral posted in the amount of 140 percent of the margin loan, which is $700 of Security Q . . . .  Separately, hedge fund Customer B, intending to open a short position in the same security, first deposits $350 of cash into its brokerage account . . . and then borrows $700 of Security Q from the dealer bank . . . pledging and depositing a total of $1,050 with the dealer bank ($700 in cash collateral and the $350 in its brokerage account). . . .  The dealer settles Customer B's short sale by using the securities pledged by Customer A for its margin loan, effectively internalizing the two positions.").

put an already existing position in shares or cash, but the bank must have such already existing shares or cash in the first place before it can offset any such position with another position. Neither the Bank of England nor the Fed explanation cited by Dr. Carr contemplates, much less condones, making up positions out of whole cloth.

The rules of the London Stock Exchange likewise do not support Dr. Carr's opinions that the Solo custodians "net settled" defendants' trades with no shares or cash. (Defs. Br. 5.) Those rules were inapplicable to defendants' over-the-counter trades. (SKAT Br. 11-12.) As defendants acknowledge, none of the sources on which Dr. Carr relies "say whether 'settlement without shares' was 'possible' in the precise circumstances at issue here." (Defs. Br. 5.)[2] The only authority to address that issue is the U.K. Financial Conduct Authority, which concluded, contrary to Dr. Carr's opinions, that "net settlement as the result of a 'self-balancing loop,' in which none of the participating parties held shares at the outset of the transactions cannot result in share ownership" or "entitlement to a real dividend which gives the recipient rights against the issuer of the securities." (Weinstein Decl. Ex. 21, Annex C ¶ 12.)

Defendants attempt to brush aside the FCA's conclusions as "irrelevant," but their

---

2. The Bank for International Settlements glossary entry for "DvP model 3" Dr. Carr cites just notes that it is a "securities settlement mechanism" that "typically settles both securities and funds on a net basis, with final transfers of both securities and funds occurring at the end of the processing cycle." (Weinstein Decl. Ex. 10 at 2). The Banque de France source that Dr. Carr cites likewise just notes that "DvP Model 3" provides for "net simultaneous settlement of securities and funds." (Weinstein Decl. Ex. 24 at 3.) Chapter IV of EU Regulation No. 909/2014 on "Internalised Settlement" requires "[s]ettlement internalisers" to "report to the competent authorities of their place of establishment on a quarterly basis the aggregated volume and value of all securities transactions that they settle outside securities settlement systems." (Weinstein Decl. Ex. 11 at 25.) The European Securities Markets Authority ("ESMA") report on which Dr. Carr relies "assess[es] the extent of the settlement activity in the EEA which does not take place through a securities settlement system." (Weinstein Decl. Ex. 15 at 4.) And the European Banking Federation source Dr. Carr cites provides that group's views on ESMA guidelines for reporting of internalized settlements. (Weinstein Decl. Ex. 19 at 2.) While these materials show that settlement netting and internalization do occur—something that SKAT does not dispute— they do nothing to substantiate Dr. Carr's opinions that net settlement or internalization allowed the Solo custodians to settle trades without any shares or cash. Defendants' claim that SKAT permits Danish taxpayers to pay their taxes on a net basis is a complete non-sequitur. (Defs. Br. 3.)

arguments make little sense.  (Defs. Br. 6-7.)  If the British Solo custodians' British regulator concluded that net settlements without shares or cash "violated British securities laws," (Defs. Br. 6), that would bear directly on the reliability of Dr. Carr's proposed testimony that such net settlements were consistent with industry practice and effective to settle the trades.  Indeed, the FCA found "no evidence of ownership of the shares by the Solo Clients, or custody of the shares and settlement of the trades by the Solo Group." (Weinstein Decl. Ex. 20 ¶ 2.10.)  And contrary to Dr. Carr, the FCA concluded that the "systematic and premeditated practice of setting trades off against one another, in the absence of any real shares or money, constituted an abuse of the normal (albeit exceptional) industry practice of internalised, or book-entry, settlements." (Weinstein Decl. Ex. 21 ¶ 4.20.)

Nor does it matter that the FCA's regulatory actions were against "non-parties to this litigation."  (Defs. Br. 6.)  Dr. Carr's opinions themselves concern non-parties to this litigation, *i.e.*, the Solo custodians, and the FCA's regulatory actions arose from the Solo custodians' and Indigo's identical circular trading schemes at issue in this litigation and on which Dr. Carr opines.[3]  That the FCA did not go so far as to conclude that the defendants' tax refund claims were fraudulent, as that issue was "beyond the scope" of its "inquiry," (Defs. Br. 6-7), again misses the point that the FCA's conclusions undermine Dr. Carr's contrary opinions.

Finally, the Court should decline defendants' invitation to abandon its "gatekeeping" role "to ensure the reliability" of Dr. Carr's testimony, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 1176 (1999), because SKAT did not question Dr. Carr about his sources at his deposition.  (Defs. Br. 6.)  SKAT questioned Dr. Carr repeatedly at his deposition about his

---

3.  Indigo Securities Limited issued dividend credit advices that defendant Markowitz's Routt Capital plan submitted to SKAT as part of its tax refund claims at issue in this trial.

net settlement opinions.  (*See* Declaration of Marc A. Weinstein, dated July 19, 2024

("Weinstein Reply Decl."), Ex. 1 (Carr Dep. Tr.) 218:10-230:17.)  And it is defendants' burden

to establish "by a preponderance of the evidence that the admissibility requirements of Rule 702

are satisfied," irrespective of what questions SKAT asked at Dr. Carr's deposition.  *United States*

*v. Gatto*, No. 17-CR-0686 (LAK), 2019 WL 266944, at *6 (S.D.N.Y. Jan. 17, 2019) (quotation

omitted), *aff'd*, 986 F.3d 104 (2d Cir. 2021).

## II.    Dr. Carr's opinions concerning net settlement are irrelevant and prejudicial.

Dr. Carr's opinions on net settlement are likewise irrelevant and prejudicial because even

assuming *arguendo* that the Solo custodians could have net settled the defendants' "trades"

without shares or cash, that would not have resulted in the plans owning shares or dividends

under Danish law as the defendants represented in their tax refund claims.  Nor is it at all

relevant whether the plans had contractual so-called "economic claims" to dividends against the

short sellers or the Solo custodians in the absence of any entitlement to dividends paid by the

issuer.  (SKAT Br. 15-16.)  Defendants' arguments to the contrary mischaracterize the Court's

summary judgment opinion, Danish law, and SKAT's argument.

SKAT did not, as defendants contend, "mischaracterize" the Court's summary judgment

opinion.  (Defs. Br. 9.)  And defendants' argument otherwise is in any event a red herring.

Defendants ignore that the Court "agree[d] with SKAT that[] Danish civil law follows the

doctrine '*nemo dat quod non habet*' ('no one gives what they do not have'), including with

respect to transfers of ownership of shares," and that "[n]othing in Danish tax law supplants this

basic concept of Danish civil law, and therefore if a seller does not have ownership rights under

Danish civil law, there is no construct in Danish tax laws that could convey or create an

ownership right in a buyer."  *In re Customs & Tax Admin. of the Kingdom of Denmark (SKAT)*

*Tax Refund Litig.*, No. 18-CV-04051, 2023 WL 8039623, at *8 (S.D.N.Y. Nov. 20, 2023)

(internal quotation omitted).  Thus, even if, as defendants argue, the Court were just summarizing SKAT's position when it stated that "the starting point would be whether the [sellers] from which the defendants purportedly purchased the shares owned the shares in the first place," that conclusion nonetheless follows logically from the principles of Danish law that the Court recognized.  *Id.* at *9.[4]

Defendants may consider the Danish "legal proposition" that a seller cannot convey ownership of shares it does not own and never delivers "hotly contested."  (Defs. Br. 8-9.)  But defendants' citations to their Danish legal expert's summary judgment Rule 44.1 declaration that the Court already considered are no ground for the Court to reverse its finding that Danish civil law follows the *nemo dat* principle.  Nor is that principle "contrary to the whole idea of short selling."  (Defs. Br. 9.)  As SKAT's expert Henning Aasmul-Olsen has explained, under Danish law, a short sale is "effective to make the purchaser . . . an owner of a share" only if "the short seller has acquired the shares and delivered them to the purchaser."  (ECF No. 1073 ¶ 78.)

That proposition is consistent with the description of short selling in the Securities and Exchange Commission Staff Report on which defendants rely as involving the short seller "borrow[ing] the stock from someone else to sell it at the current price."  (*SEC Staff Report on Equity and Options Market Structure Conditions in Early 2021* (Oct. 2021), at 24 n.74.)[5]  The GameStop example does not, as defendants contend, show that a short seller can sell shares it

---

4.  SKAT disagrees with defendants' reading of the Court's decision.  The Court first noted SKAT's argument that "defendants' reliance on 'binding agreements' . . . is flawed because the purported seller never owned any shares or had any rights to shares or dividends."  *Id.* at *9 (internal quotation omitted).  And then the Court concluded, "[a]ccordingly, even if Danish tax law were," as defendants argue, "a source for the definition of beneficial ownership, in these circumstances, the starting point would be whether the [sellers] from which the defendants purportedly purchased the shares owned the shares in the first place."  *Id.*  And, the Court continued, "[i]f the [sellers] never owned the shares that they allegedly sold to the defendants, the Court might not need to reach the question of whether the defendants beneficially owned the shares."  *Id.*

5.  Available at https://www.sec.gov/files/staff-report-equity-options-market-struction-conditions-early-2021.pdf.

never acquires.  As the SEC explained, "[s]hort interest can exceed 100%—as it did with GME—when the same shares are lent multiple times by successive purchasers," *i.e.*, "[i]f someone purchases a stock from a short seller and subsequently lends the stock out again."  (*Id.* at 25.)  Ownership interests would not exceed 100 percent of the issued shares under Danish law in those circumstances because the original purchaser disposes of its ownership interest in the shares by lending them to the second short seller which disposes of its ownership interest by selling them to the second purchaser.  (ECF No. 1073 ¶¶ 72-78.)[6]

Further, there is no merit to defendants' straw man that SKAT's arguments assume that the fact that the Solo custodians never held any shares has been established already.  (Defs. Br. 8.)  SKAT's argument is that the truth of the defendants' representations in the tax refund claims turns on whether the shares existed, so Dr. Carr's proposed testimony that the Solo custodians could have net settled trades absent any shares is irrelevant and likely to distract the jury from that dispositive factual question of whether the shares existed in the first place.[7]

---

6.  The journal article on Article 8 of the Uniform Commercial Code defendants cite in their brief on foreign law issues likewise does not support their argument.  (Defs. Br. 8.)  As the author of that article explains, *nemo dat* does not apply to securities trades under U.S. law in the sense that a securities trade is final and cannot be undone by claims that the seller did not have the right to transfer the shares.  (ECF No. 1076-19 at 1461-62.)  But that does not mean a seller can transfer ownership of shares it never delivers to the buyer.

7.  Defendants attempt to sneak in "other record evidence" on which Dr. Carr did not rely to argue that his net settlement opinions are reliable.  (Defs. Br. 7.)  But none of this "other record evidence" lends credence to Dr. Carr's proffered testimony.  The representative of VP Securities, the Danish central securities depository, just testified that if a VP Securities account holder custodian's customers entered offsetting trades, the custodian "would have nothing to report to VP Securities."  (ECF No. 1087-1 at 62:8-22 (Q: "And client A bought one hundred shares and client B sold one hundred shares, do you have that in mind?"  A: "Yes."  Q: "At the end of the day, the custodian would have, assuming it started the day with no shares, it would end the day with no shares, correct?"  A: "Correct."  Q: "It would have nothing to report to VP Securities, correct?"  A: "That is correct.").)  And, in any event, she clarified that her response was premised on the custodian actually holding shares and that net settlement would be irrelevant because it cannot give rise to dividends.  (Weinstein Reply Decl. Ex. 2 (Sorensen Dep. Tr.) 27:10-28:25.)  Nor do defendants' legal expert's arguments that "ordinary trading activity can result in claims to ownership of shares in excess of the number of shares issued by the company" make Dr. Carr's unsubstantiated opinions on net settlement reliable.  It is of no moment if multiple parties may "claim" ownership of the same share because only one can be the true owner.  Mere claims to ownership cannot increase the number of shares a company has issued or obligate the company to pay dividends based on any such mistaken claims.

**III.    Dr. Carr's opinions on what SKAT's experts demonstrated about defendants' knowledge are inadmissible.**

Dr. Carr's proffered testimony on what SKAT's experts failed to demonstrate concerning what the defendants knew is not, as defendants argue, "appropriate" expert testimony.  (Defs. Br. 10.)  SKAT's experts did not opine on what defendants knew and nor could they have, so Dr. Carr's testimony about what SKAT's experts "failed to" prove in that respect "is both irrelevant and inadmissible."  *Sec. & Exch. Comm'n v. Lek Sec. Corp.*, 370 F. Supp. 3d 384, 410 (S.D.N.Y. 2019), *on reconsideration in part*, No. 17CV1789 (DLC), 2019 WL 2114067 (S.D.N.Y. May 8, 2019).

## CONCLUSION

For the reasons set forth above and in SKAT's Memorandum of Law in Support of its Motion, SKAT respectfully requests that the Court exclude Dr. Carr's proposed expert testimony on net settlement and "economic claims" to dividends.

 Dated: New York, New York             HUGHES HUBBARD & REED LLP
      July 19, 2024

By: /s/ Marc A. Weinstein
     William R. Maguire
     Marc A. Weinstein
     Neil J. Oxford
     Dustin P. Smith
     Gregory C. Farrell
     One Battery Park Plaza
     New York, New York 10004-1482
     Telephone: (212) 837-6000
     Fax: (212) 422-4726
     bill.maguire@hugheshubbard.com
     marc.weinstein@hugheshubbard.com
     neil.oxford@hugheshubbard.com
     dustin.smith@hugheshubbard.com
     gregory.farrell@hugheshubbard.com

     *Counsel for Plaintiff Skatteforvaltningen*
     *(Customs and Tax Administration of the*
     *Kingdom of Denmark)*