# Exhibit 13

# OPUS2

Skatteforvaltningen v Solo Capital Partners LLP & Others

Day 19MT

May 23, 2024

Opus 2 - Official Court Reporters

Phone: 020 3008 6619
Email: transcripts@opus2.com
Website: https://www.opus2.com

Confidential                                                         SKAT_MDL_001_00838246

| | |
|---|---|
| 1    recall that they had their own personal pension plans | 1    from the perspective of the pension plan and they seemed |
| 2    that had been in existence for years. It could be the | 2    to be satisfied with that. They were aware that Solo |
| 3    case that they didn't use those for this trading. | 3    was acting as a custodian and clearer and therefore |
| 4  Q. They may well have had, but they didn't use it for this | 4    naturally Solo would be responsible for settlements. |
| 5    trading, as you say. Many of the Argre plans, the | 5  Q. Mr Shah, I'm trying, I really am, I'm not just being |
| 6    original Argre plans, had no money in their Solo | 6    difficult about this —— why would they have been willing |
| 7    accounts when they began GSS trading; do you recall | 7    to participate in a scheme where they couldn't possibly |
| 8    that? | 8    have understood why it was that they didn't need to |
| 9  A. Yes, I would agree with that. | 9    obtain any funding unless you explained to them that |
| 10  Q. Yes. And the fact that they didn't have any money in | 10    effectively there was going to be a loop which meant |
| 11    their Solo cash accounts when they started trading | 11    that ultimately everything would be zero settled? |
| 12    wasn't a problem because of course the GSS Model didn't | 12  A. No, I didn't explain to them the loop. The loop is |
| 13    require the US pension plans to have any cash at all in | 13    quite a recent concept for me and it was necessary for |
| 14    order for them to trade, correct? | 14    them to understand that they were lending the shares out |
| 15  A. Yes, that's correct. | 15    in order to raise cash to purchase the shares. I think |
| 16  Q. Can I just ask you this: by 2012, you had been engaged | 16    that is all they needed to know. They seemed to be |
| 17    in cum—ex trading with Argre for a number of years | 17    happy with that. I don't have any recollection of any |
| 18    including in relation to the Broadgate transaction, | 18    hesitancy on their side. As well as that, they were |
| 19    correct? | 19    also quite resourceful in terms of getting their own |
| 20  A. Yes, correct. | 20    advice and they were —— if needed, they were able to |
| 21  Q. And you had obviously built a relationship of trust with | 21    fund these accounts. But we told them that on this |
| 22    them, correct? | 22    occasion they didn't need to do that. |
| 23  A. Yes, correct. | 23  Q. So what it seems you are saying, Mr Shah, is that you |
| 24  Q. And they had invested substantial capital in both the | 24    withheld even from your trusted investor the fact that |
| 25    Broadgate and Ezra transactions as well, correct? | 25    the GSS Trading Model did not involve any external |
| 13 | 15 |
| 1  A. Yes. So I did mention that I don't recollect at the | 1    movement of shares? |
| 2    time —— sorry, I don't recollect the Ezra trade, but | 2  A. Solo was talking —— I was talking and Solo was talking |
| 3    I was reminded about that a couple of days ago. So yes, | 3    to Argre in the context of providing services to |
| 4    I agree with you. | 4    a client. Our conversation was limited to providing |
| 5  Q. Would you have explained to Argre, and I suggest you | 5    those services. The activities beyond their involvement |
| 6    must have, that under the GSS Trading Model it would not | 6    was not of their concern and it was in fact |
| 7    be necessary for them to invest capital? | 7    confidential. So it is not normal for a prime broker or |
| 8  A. Yes, and specifically the explanation would have been | 8    a custodian to discuss the business of other clients |
| 9    that they would have been able to —— that the pension | 9    with each other. |
| 10    plans would have lent their shares out in order to raise | 10  Q. Mr Shah, these people, you told me, were people you |
| 11    the cash needed to pay for the shares, so that was the | 11    trusted. You had done other transactions with them. |
| 12    reason for no requirement for external money. | 12    But you were still not willing to tell them the truth |
| 13  Q. And they would also have understood that no external | 13    about exactly what it is your scheme involved, correct? |
| 14    leverage and financing would be required because the GSS | 14  A. No, that's not correct. No, that's not correct. |
| 15    Trading Model didn't involve any external movements of | 15  Q. You didn't tell them the truth about what your scheme |
| 16    shares as the trade would all be internally settled to | 16    involved. You withheld key aspects of that scheme from |
| 17    zero within Solo, correct? | 17    them? |
| 18  A. I don't recall explaining that to them, no. I explained | 18  A. No, that is not correct. We gave them the information |
| 19    to them the activities of the pension plan from the | 19    that they needed and they decided to participate. |
| 20    pension plan's perspective. | 20  Q. So you gave them half the story because you were not |
| 21  Q. But they must have been interested to understand how it | 21    willing to give them the whole story? |
| 22    was that no external leverage or financing would be | 22  A. I wouldn't say half the story. I would say even less |
| 23    required? | 23    than that, probably an eighth of the story, yes. |
| 24  A. I don't remember any specific conversation about that. | 24  Q. Right. Well, I'm happy to go with that. Can I move on |
| 25    I explained or we explained the fact pattern to them | 25    to the Zeta plans, then, Mr Shah and for this purpose |
| 14 | 16 |